**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **JOSE REYES,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :   **Civ. No. 07CV1236 (WWE)** |
| | : |
| **CITY OF BRIDGEPORT,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OF DECISION ON SUMMARY JUDGMENT

Plaintiff Jose Reyes, a former police sergeant with the Bridgeport Police Department, has brought this action against defendant City of Bridgeport, alleging racial discrimination, a racially-hostile work environment and retaliation for filing complaints of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Defendant has filed a motion for summary judgment.  For the following reasons, the motion will be granted.

## BACKGROUND

The parties have submitted statements of fact, affidavits, and exhibits, which reveal the following undisputed facts.

Plaintiff is a former sergeant in the Bridgeport Police Department.  He retired with a disability pension in May 2008 after seventeen years of service.

Between April 2006 and October 2008, Bryan Norwood was the Chief of the Bridgeport Police Department.  Chief Norwood was succeeded by Joseph Gaudett, who became the Acting Chief of Police on October 14, 2008.

1

In 2004 and 2005, plaintiff was assigned to the Bridgeport Police Department's Office of Internal Affairs ("OIA"), at which time he investigated complaints of excessive force against Officers Bepko, Rodrigues and Stepniewski.  Plaintiff sustained the charges against these officers.  After disciplinary hearings, the Bridgeport Board of Police Commissioners exonerated the officers.  Plaintiff claims that these officers later threatened him for sustaining the charges.

In October 2004, someone wrote "Fuck Chi Chi and OIA" on the bathroom stall at the Police Department Headquarters.  At this time, plaintiff was investigating an excessive force case against some police officers, and "Chi Chi" is a nickname that Reyes went by when employed in the Bridgeport Police Department.  The writing was reported to department superiors and removed.  The individual who wrote the statement was not ascertained.

In September 2005, Reyes claims that his police vehicle was vandalized when he was undergoing K-9 training.  The gas cap to the vehicle was opened up and a cookie was stuffed into the gas tank.  Plaintiff, who was then still assigned to the OIA, had parked his vehicle where he normally parked outside the entrance to the OIA headquarters.  Plaintiff notified dispatch and an officer investigated, although the attempt to take fingerprints was unsuccessful.

Plaintiff was later transferred to K-9 unit.  At that time, the Bridgeport Police Department operated a unit known as the Commuter Assisted Dispatch ("CAD").  CAD is the division that handles all calls coming into the Bridgeport Police Department, and it dispatches and assigns calls to officers patrolling the streets.  CAD uses both sworn police officers and civilian employees, who take the calls from the public, assess them

2

and then dispatch patrol officers through the department's communication system. Under certain circumstances, CAD dispatchers are trained to send a "backup" officer on calls which are handled by the original responding officer.  After a CAD dispatcher determines that a backup is required, he or she will ask for volunteer officers who are available to go to the site where the primary officer is being sent to act as that officer's backup.  If no volunteer officer is available, CAD will order an officer to act as backup.

On January 3, 2006, plaintiff was assigned a "backup" on a traffic stop.  Plaintiff claims that it took too long for the backup to arrive.

On March 14, 2006, plaintiff responded to a false alarm call at a restaurant called Tartaglias.  Plaintiff, who was the first officer on the scene, learned from the owner that it was a false alarm.  Shortly thereafter, Officer Mercado arrived and closed the matter. Plaintiff believes that other officers could have and should have arrived earlier than Officer Mercado.

On July 13, 2006, plaintiff made a traffic stop on North Avenue.  He never requested a backup on his call, although he notes that no officer drove by to make sure he was alright during this stop.  Plaintiff did not file a complaint claiming that he did not receive sufficient backup or cover on this call.

On August 25, 2006, plaintiff told Chief Norwood that certain officers would not back him up on police calls.  Plaintiff believed that the officers' failure to provide back up stemmed from his assignment at the OIA and his investigation into excessive force claims.  Plaintiff maintained that he had heard that Sergeant Cummings would not provide him backup if he needed it.  When plaintiff made this complaint to Chief Norwood, he had already been transferred out of the OIA and was assigned to the K-9

3

unit.  Chief Norwood investigated plaintiff's complaint.  As part of this investigation, Chief Norwood interviewed Sergeant Cummings, who denied that he had ever stated that he would not provide plaintiff with backup.  Chief Norwood counseled Sergeant Cummings about the importance of backing up officers who need it, and he indicated that failure to do so would result in disciplinary action.

In May 2006, plaintiff requested that Chief Norwood consider purchasing bullet proof vests for canines in the K-9 unit.  Chief Norwood did not purchase any canine bullet proof vests.

In November 2006, the central station was undergoing renovation.  Lieutenant Robert Craw instructed plaintiff to review the contents of the cabinet labeled "K-9" to determine what should not be discarded.  The cabinet was not Reyes' own personal cabinet but belonged to the K-9 unit.  Other cabinets in the central station were being emptied out in preparation for the renovation and move to the East Side Precinct.   The next day, plaintiff returned to work to find that the K-9 cabinet had been emptied after Craw issued an order for an officer to empty the cabinet.

In November 2006, plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), asserting that he had endured harassment and discrimination.

From March 28 until December 2007, plaintiff was on sick and injury leave due a shoulder injury.  Pursuant to departmental policy, an officer who is on sick leave for more than 20 consecutive sick days is transferred to the command of the Sick and Injury Management Office for the purpose of monitoring the officer's status and efforts to return to service.  During the time relevant to this action, Lieutenant A.J. Perez was

4

the officer in charge of the Sick and Injury Management Office.  In June 2007, plaintiff was removed from the K-9 unit and transferred to the Sick and Injury Management Office.

Pursuant to the Bridgeport Police Department policy on Sick and Injury Management, plaintiff's assignment in the K-9 unit was put out to bid after he had been out on sick leave for 30 consecutive days.  The assignment to Sergeant Kevin Gilleran was made because he was the most senior qualified candidate who bid for the position.

The dogs in the K-9 unit are the property of the City of Bridgeport.  The dog assigned to each officer in the K-9 unit is expected to be housed by that officer but the City provides the cost for food, veterinary care and handling equipment.

Plaintiff understood that he was not guaranteed his prior position in the K-9 unit when he returned to work.  He signed a "Transfer Agreement" to assume ownership of the dog that had been assigned to him in the K-9 unit.

When plaintiff returned to work in December, he was assigned "light duty capacity" in the overtime office.  Light duty assignments are subject to the discretion of the Chief of Police.

In March 2008, plaintiff was transferred to the midnight shift.  Plaintiff asserts that this transfer was made because he confronted the union about a promotional exam issue.

In June 2008, plaintiff retired from the Bridgeport Police Department with a disability pension.  Plaintiff claims, that prior to his retirement, he had been informed that there were no vacancies on the 8 a.m. to 4 p.m. shift.  However, after plaintiff retired, the Mayor and Board of Police Commissioners decided to transfer Sergeant

Albert Karpus to the 8 a.m. to 4 p.m. shift in the OIA.  Sergeant Karpus had not been

out on sick and injury leave at the time prior to his transfer.

In July 2008, plaintiff read a newspaper article about a bullet proof vest being

donated for the canines in K-9 unit.

## **DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue

as to any material fact and it is clear that the moving party is entitled to judgment as a

matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when

reasonable minds could not differ as to the import of the evidence is summary judgment

proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material

factual issue genuinely in dispute.  American Int'l Group, Inc. v. London American Int'l

Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual

issue exists, the court must resolve all ambiguities and draw all reasonable inferences

against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential

element of his case with respect to which he has the burden of proof, then summary

judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion

for summary judgment is not met.  Anderson, 477 U.S. at 249.

Disparate Treatment Due to Race

This is a disparate treatment case based on circumstantial evidence relative to

plaintiff's termination.  Accordingly, the Court analyzes plaintiff's claims of disparate

6

treatment and retaliation according to the burden shifting process established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981).

To establish his prima facie claim of racial discrimination, plaintiff must demonstrate that (1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Although the plaintiff's initial burden is not onerous, he must show that the alleged adverse employment action was not made for legitimate reasons.  Thomas v. St. Francis Hosp. & Med. Ctr., 990 F. Supp. 81, 86 (D. Conn. 1998).

If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. The plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

As adverse employment actions, plaintiff alleges: (1) defendant failed to provide him with backup police coverage when he made certain police stops or calls; (2) he was threatened by certain officers; (3) derogatory statements were written about him on a bathroom wall at police headquarters; (4) his police vehicle was vandalized; (5) the K-9 unit's cabinet was cleaned out before he could review the contents; (6) the police chief failed to consider his proposal to acquire canine bullet proof vests; (7) he was removed from the K-9 unit without just cause and forced to sign an agreement to take ownership of his K-9 unit dog; (8) he was not placed back in the K-9 unit when he returned to work

7

on light duty status; and (9) he was improperly transferred to the midnight shift.

Defendant argues that plaintiff cannot establish that he suffered an adverse employment action, or that any of the alleged actions occurred under conditions giving rise to an inference of discrimination.

Title VII does not create a "general civility code" for the workplace. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). The question is whether the slights identified by plaintiff constitute an adverse employment action, which is defined as a materially adverse change in working conditions that is more disruptive than a mere inconvenience or an alteration of job responsibilities. William v. R.H. Donnelley, 368 F.3d 123, 128 (2d Cir. 2004); Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 64 (2d Cir. 2000).

Here, with the exceptions of the transfer out of the K-9 unit, the failure to be reassigned to the K-9 unit, and the assignment on the midnight shift, plaintiff's alleged adversary actions represent isolated incidents or temporary conditions that do not amount to a materially adverse change in working conditions.[1]

Construing the facts most favorably for the plaintiff, the transfer out of the K-9 unit, the failure to be reassigned to the K-9 unit, and the assignment on the midnight shift may be considered to be materially adverse changes to plaintiff's working conditions. For purposes of ruling on this motion, the fact that plaintiff's transfer out of the K-9 unit resulted in his having to take ownership of the dog is considered an

---

[1]Additionally, no evidence indicates that these incidents or acts occurred under conditions giving rise to an inference of racial discrimination.

adverse employment action.[2]

Nevertheless, plaintiff has not adduced evidence to indicate that these alleged actions occurred under circumstance giving rise to an inference of racial discrimination. Accordingly, the Court agrees that plaintiff has not sustained his burden of establishing the prima facie case of racial discrimination as to any of these alleged adverse actions.

Alternatively, even if the Court assumes that plaintiff has established a prima facie case as to these alleged adverse actions, plaintiff has failed to establish that defendant's legitimate business reason is pretext for racial discrimination.

The evidence demonstrates that defendant followed its Departmental policies when it removed plaintiff from the K-9 unit without guarantee that he would return to the unit; put his assignment out to bid; and reassigned another individual to the K-9 unit. According to Department policy, officers could sign a "transfer agreement" if they wanted to retain their assigned dog.  There is no evidence that defendant took any of these actions due to racial animus or that these policies are pretext for such racial bias against plaintiff.

By deposition, plaintiff ventures that Caucasian officers were treated differently. Plaintiff must present evidence that he was treated differently than others "similarly situated."  Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005), overruled on other grounds, Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008).  To be similarly situated, the individuals with whom plaintiff attempts to compare himself must be similarly situated in all material respects and have "engaged in comparable conduct."  Shumway v. United

---

[2]As owner of the dog, plaintiff was required to pay for the dog's upkeep.

Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).  Plaintiff fails to identify many of the officers who were treated differently and provides no specifics as to those whom he identifies.  The Court cannot ascertain whether these individuals were similarly situated in all material respects.

As to plaintiff's transfer to the midnight shift, defendant sets forth that the assignment was made without consideration of plaintiff's race or ethnicity.  Plaintiff points out that Officer Karpus, a Caucasian, was assigned to a day shift in the OIA one month after his retirement.  However, this evidence fails to give rise to an inference of pretext for discriminatory animus because plaintiff's comparator is not similar in all material respects.  Officer Karpus's assignment differs from that sought by plaintiff because the OIA assignment was made by the Mayor and Board of Police Commissioners rather than by the Chief of Police.  Accordingly, the Court will grant the motion for summary judgment on the claims of disparate treatment due to racial discrimination.

Retaliation for Filing Complaints of Employment Discrimination

Similarly, the Court will also grant summary judgment on plaintiff's claim of retaliation, which is predicated on the same set of facts.

To establish a prima facie case of retaliation under Title VII, a plaintiff is required to show by a preponderance of the evidence that: (1) he participated in a protected activity, (2) the defendant knew of the protected activity; (3) he experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  The McDonnell Douglas burden shifting analysis applies to retaliation

10

claims brought pursuant to Title VII.  See Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).

As stated previously with respect to plaintiff's racial discrimination claims, the Court finds that only the transfer out of the K-9 unit, the failure to be reassigned to the K-9 unit, the transfer of ownership of plaintiff's assigned canine, and the assignment on the midnight shift can be considered adverse employment actions.  However, plaintiff has generally failed to set forth specific facts or evidence concerning his alleged engagement in protected activity or how a causal connection exists between his protected activity and the aforementioned alleged adverse actions taken against him.

In his CHRO complaint, he states that he believed that defendant "intentionally engaged in this conduct for the purpose of retaliating against me for having opposed its discriminatory practices."  In his deposition, plaintiff ventured that he believed he was transferred to the midnight shift because he had angered the Chief of Police by filing a CHRO complaint and because he had confronted the union about a promotional exam issue.  Plaintiff cannot support his retaliation claim with conjecture.  Further, the CHRO filing, which occurred in November 2006, is attenuated in time from plaintiff's transfer to the midnight shift in March 2008.  "While the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, the weight of authority supports the view that ten or twelve months is too long."  Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 617 (S.D.N.Y. 2008).

Thus, the Court finds that plaintiff has not established an inference that a causal connection exists between any alleged adverse action, including his transfer to the

midnight shift, and his protected activity.  Accordingly, the Court will grant summary

judgment in defendant's favor.

Hostile Work Environment

Plaintiff alleges that he was subjected to a hostile work environment due to his

race.  However, the parties' briefs do not substantively address this claim.  Upon review

of the evidence, the Court finds that summary judgment should be granted in

defendant's favor on this claim.

A hostile work environment exists in violation of Title VII when the workplace is

permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.  Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 20 (1993).  To prevail

on a hostile work environment claim, plaintiff must show both (1) that his workplace was

permeated with discriminatory intimidation that was sufficiently severe or pervasive to

alter the condition of his employment, and (2) that a specific basis exists for imputing to

the employer the conduct that created the hostile environment.  Briones v. Runyon, 101

F.3d 287, 291 (2d Cir. 1996).  Relevant factors include the (1) frequency of the

discriminatory conduct, (2) the severity of the conduct, (3) whether it is physically

threatening or merely an offensive utterance, and (4) whether it unreasonably interferes

with an employee's work performance.  Harris, 510 U.S. at 23.  A hostile work

environment claim is subject to both subjective and objective measurement: a plaintiff

must demonstrate that he personally considered the environment hostile, and that the

environment rose to some objective level of hostility.  Leibovitz v. New York City Transit

Auth. , 252 F.3d 179, 188 (2d Cir. 2001).

12

Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.  See Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).  However, one act that is sufficiently severe may alter the plaintiff's conditions of employment without repetition.  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

In this instance, the incidents alleged to comprise the hostile work environment occurred between October 2004 and March 2008.   Many of these incidents, such as the failure to respond to plaintiff's request for canine bullet proof vests or the clearing out of the canine locker, cannot be considered to be severe or hostile.  The vandalism of plaintiff's car is not attributable to anyone at the Bridgeport Police Department. Plaintiff has failed to show that any of the alleged acts were attributable to his race.

Accordingly, the Court cannot find that plaintiff was subjected to a work environment permeated with discriminatory intimidation sufficiently severe or pervasive to alter the condition of his employment.  Summary judgment will be granted in defendant's favor.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [Doc. # 39] is GRANTED.  The clerk is instructed to close this case.

_____/s/_____
Warren W. Eginton
Senior United States District Judge
Dated this _26th__ day of October, 2009 in Bridgeport, Connecticut.

13